RM

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

FILED

DEC 21 2016

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Eliza Garzón )
)
)
) CIVIL ACTION
(Name of the plaintiff or plaintiffs) )
)
v. ) 1:16-cv-11525
Judge Harry D. Leinenweber
Magistrate Judge Susan E. Cox
Arrowpoint Partners, LLC )
First National Assets Management, LLC
)
(Name of the defendant or defendants) )

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

1. This is an action for employment discrimination.

2. The plaintiff is Eliza Garzón of the county of Cook in the state of Illinois.

3. The defendant is First National Assets Management, LLC [*Arrowpoint Partners, LLC], whose street address is 120 N. LaSalle St, Ste 1220 [*100 Fillmore Street, Suite 325],

(city) Chicago [*Denver] (county) Cook [*Denver] (state) IL [*CO] (ZIP) 60602 [*80206]

(Defendant's telephone number) (312)-683-0800 [*303-398-2929]

4. The plaintiff sought employment or was employed by the defendant at (street address) 120 N. LaSalle St. Ste 1220 (city) Chicago

(county) Cook (state) IL (ZIP code) 60602

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

5. The plaintiff [***check one box***]

(a) ☐ was denied employment by the defendant.

(b) ☐ was hired and is still employed by the defendant.

(c) ☑ was employed but is no longer employed by the defendant.

6. The defendant discriminated against the plaintiff on or about, or beginning on or about, (month)__________, (day)_______, (year) 2013.

7.1 ***(Choose paragraph 7.1 or 7.2, do not complete both.)***

(a) The defendant is not a federal governmental agency, and the plaintiff [*check one box*] ☐ *has not* ☒ *has* filed a charge or charges against the defendant asserting the acts of discrimination indicated in this complaint with any of the following government agencies:

(i) ☒ the United States Equal Employment Opportunity Commission, on or about (month) 6 (day) 22 (year) 2016.

(ii) ☒ the Illinois Department of Human Rights, on or about (month) 6 (day) 22 (year) 2016.

(b) If charges *were* filed with an agency indicated above, a copy of the charge is attached. ☑ YES. ☐ NO, **but plaintiff will file a copy of the charge within 14 days.**

It is the policy of both the Equal Employment Opportunity Commission and the Illinois Department of Human Rights to cross-file with the other agency all charges received. The plaintiff has no reason to believe that this policy was not followed in this case.

7.2 The defendant is a federal governmental agency, and

(a) the plaintiff previously filed a Complaint of Employment Discrimination with the defendant asserting the acts of discrimination indicated in this court complaint.

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

☐ Yes (month)_______________ (day)_______ (year) _________

☐ No, did not file Complaint of Employment Discrimination

(b) The plaintiff received a Final Agency Decision on (month)___________ (day) _________ (year) _________.

(c) Attached is a copy of the

(i) Complaint of Employment Discrimination,

☐ YES ☐ NO, but a copy will be filed within 14 days.

(ii) Final Agency Decision

☐ YES ☐ NO, but a copy will be filed within 14 days.

8. *(Complete paragraph 8 only if defendant is not a federal governmental agency.)*

(a) ☐ the United States Equal Employment Opportunity Commission has not issued a *Notice of Right to Sue.*

(b) ☒ the United States Equal Employment Opportunity Commission has issued a *Notice of Right to Sue*, which was received by the plaintiff on (month)___9___ (day)__22__ (year)__2016__ a copy of which *Notice* is attached to this complaint.

9. The defendant discriminated against the plaintiff because of the plaintiff's [***check only those that apply***]:

(a) ☐ Age (Age Discrimination Employment Act).

(b) ☐ Color (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).



[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

(c) ☐ Disability (Americans with Disabilities Act or Rehabilitation Act)

(d) ☐ National Origin (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(e) ☐ Race (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(f) ☐ Religion (Title VII of the Civil Rights Act of 1964)

(g) ☒ Sex (Title VII of the Civil Rights Act of 1964)

10. If the defendant is a state, county, municipal (city, town or village) or other local governmental agency, plaintiff further alleges discrimination on the basis of race, color, or national origin (42 U.S.C. § 1983).

11. Jurisdiction over the statutory violation alleged is conferred as follows: for Title VII claims by 28 U.S.C.§1331, 28 U.S.C.§1343(a)(3), and 42 U.S.C.§2000e-5(f)(3); for 42 U.S.C.§1981 and §1983 by 42 U.S.C.§1988; for the A.D.E.A. by 42 U.S.C.§12117; for the Rehabilitation Act, 29 U.S.C. § 791.

12. The defendant [***check only those that apply***]

(a) ☐ failed to hire the plaintiff.

(b) ☐ terminated the plaintiff's employment.

(c) ☐ failed to promote the plaintiff.

(d) ☐ failed to reasonably accommodate the plaintiff's religion.

(e) ☐ failed to reasonably accommodate the plaintiff's disabilities.

(f) ☑ failed to stop harassment;

(g) ☑ retaliated against the plaintiff because the plaintiff did something to assert rights protected by the laws identified in paragraphs 9 and 10 above;

(h) ☑ other (specify): failed to provide a safe and non-hostile workplace for its employees→



[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

•failed to investigate prior complaints

—

13. The facts supporting the plaintiff's claim of discrimination are as follows:

See attached

14. [*AGE DISCRIMINATION ONLY*] Defendant knowingly, intentionally, and willfully discriminated against the plaintiff.

15. The plaintiff demands that the case be tried by a jury. ☑ YES ☐ NO

16. THEREFORE, the plaintiff asks that the court grant the following relief to the plaintiff [*check only those that apply*]

(a) ☐ Direct the defendant to hire the plaintiff.

(b) ☐ Direct the defendant to re-employ the plaintiff.

(c) ☐ Direct the defendant to promote the plaintiff.

(d) ☐ Direct the defendant to reasonably accommodate the plaintiff's religion.

(e) ☐ Direct the defendant to reasonably accommodate the plaintiff's disabilities.

(f) ☑ Direct the defendant to (specify): Give notice to all current, future and past employees that there will



[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

never be any retaliation taken if they come forward about any type of discrimination they have encountered.

(g) ☑ If available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees.

(h) ☑ Grant such other relief as the Court may find appropriate.

(Plaintiff's signature)

[signature]

(Plaintiff's name)

Eliza Garzon

(Plaintiff's street address)

4148 S Michigan Ave #2

(City) Chicago (State) IL (ZIP) 60653

(Plaintiff's telephone number) (773) - 497-6700

Date: ____________________



[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Response to question 13.

1. I was hired by First National Assets Management, LLC ("First National") in February 2011 as a Portfolio Administrator. At the time of my constructive discharge on April 26, 2016, I was a Tax Lien Servicing Supervisor, responsible for performing duties relating to servicing tax liens.

2. It is my understanding that Arrowpoint Partners, LLC ("Arrowpoint") became the majority owner of First National and assumed control of labor relations over the employees who had been First National employees in approximately August 2015.

3. Ms. Stamatoglou (First National COO) was my supervisor while I worked at First National and Arrowpoint.

4. James Athanasopoulos is a co-founder of the James Group. It is my understanding that he or one of the companies that he owns purchases many of First National's properties, and he is on First National's or one of its affiliate's advisory board.

5. Mr. Athanasopoulos frequently came to the First National offices where I worked under the supervision of Stamatoglou. Beginning in about 2013, I often complained to Stamatoglou about Mr. Athanasopoulos' frequent offensive sexual remarks to me and the other employees in the office. As early as about 2013 I complained to Stamatoglou in an email about one such comment that Athanasopoulos made to me and asked to speak to her about it. Athanasopoulos sent me back a handwritten apology saying that he was sorry for offending me and that he thought that because of our rapport it was okay for him to "say something stupid"

He characterized it as a "joke." Unfortunately, his offensive sexual, as well as racial, comments did not stop after he gave me the apology note.

6. Later, in 2013 or 2014, when our company moved into a new space, the First National receptionist, Kiki Kouris, did not at first have her desk set up. As a result, she was temporarily working out of an office. Athanasopoulos asked me who she "f . . . d" to get an office. I told Athanasopoulos not to talk about Kiki like that. Nevertheless, Athanasopoulos continued to make the same comment to Kiki and others in the office.

7. In the period of 2014, 2015, and 2016, Athanasopoulos continued to make offensive, sexual remarks to me and other employees in the workplace. By way of example, he told me I would be prettier if my "boobs" were bigger. He said to me, "Wow, are you on your period? Your boobs look bigger today." He told me to look at Lunya Fulton's boobs, that she has nice boobs and didn't I wish I had her boobs. On another occasion he told me, "You know who has nice boobs? Pam" (an employee from another company that we shared space with). Another example is when he asked me if I thought that Laura McNellis (Director of First National's REO division) and Stephen Deely (in-house counsel) got it on at the conventions they go to and then said that he believed that they do. Another time he asked me if I knew that Susan Mallmann's (Controller) husband cheats on her while he is away on business. Another offensive comment was when he asked me if I "wax down there" (meaning my private parts).

8. On another occasion during this period Athanasopoulos brought a pair of women's panties to me and smelled them. He told me that he took them from Laura's purse. I told him he was disgusting and he should never go into a woman's purse. He continued to hold

them up and walked them around the office, asking other employees if they would like to smell them.

9. In November or December 2015, Stamatoglou, Tommy Diamantopoulos (a First National REO broker), and I were in the office kitchen. Athanasopoulos came up to me, with Stamatoglou standing right next to me. Athanasopoulos said to me, "I will buy you some boobs. All I ask is that you let me finish on them once a month." Stamatoglou just laughed. I told Athanasopoulos how disgusting he was. I felt humiliated, degraded, and disgusted. I walked out of the kitchen in considerable distress. I believe Tommy Diamantopoulos heard what Athanasopoulos said, because when I looked at him, his face looked to me like he was in shock.

10. In November or December, 2015, Athanasopoulos hit me with his umbrella in my breasts as he walked past me. He did this deliberately. I immediately went to Stamatoglou's office and complained to her about this action. Stamatoglou got upset and told me that I was not the only one who kept complaining about him. She said he would not be allowed back.

11. In the following week Athanasopoulos returned to our office. After he left I went into Stamatoglou's office and reminded her that she told me that he would not be allowed back. She told me that she told him to stay away from me and that he would not be allowed in the new offices that we were moving to.

12. In early 2016, after a real estate convention that Stamatoglou had attended with John Eisinger, Managing Director of Arrowpoint, and Laura McNellis, Stamatoglou called me into her office and told me that she felt that Eisinger was dancing very inappropriately with

Laura. My first thought was that perhaps Laura had been uncomfortable with the situation, and so I told Stamatoglou that perhaps Laura did not know who to talk to about that. Stamatoglou gave me a strange look and told me how naive I was. She said I would be surprised as to what people would do to get ahead.

13. In approximately late March 2016, we moved into the new office space. On April 7, 2016, I was shocked when Athanasopoulos walked into the new space, as Stamatoglou had assured me that he would not be permitted in the new space. I emailed Stamatoglou immediately after he walked in. I sent her an email stating that I thought that Athanasopoulos was not welcome in the new space and indicated my displeasure. Athanasopoulos was standing next to Stamatoglou at the time, and very shortly after I sent the email, he came out in front of where I sit, spun around with his arms raised, smiled, and stared at me. Stamatoglou at first attempted to deny that she had made the statement that Athanasopoulos would not be allowed in the new space. She indicated in the emails that he bought most of Laura McNellis' (Director of First National's REO division) properties, that he was on a First National Advisory Board, and that he was her "bestie." In response, I reminded her in an email that this is what she had told me after Athanasopoulos hit me in my breasts with his umbrella and that after he had come back, I asked why he was back and she told me that she had told him not to talk to me anymore and that he would not be allowed in the new space. Stamatoglou then sent me an email claiming that she did not remember that and that she only remembered that I had been upset about the "alleged incident." She asked if I wanted to file a formal complaint, and, if so, she would let HR know.

14. Stamatoglou ultimately told me that the person to contact to file a formal complaint was Jill Jepson, an Arrowpoint HR person. I then sent the email thread between me and Stamatoglou to Ms. Jepson and asked her how I would go about filing a formal complaint. I did not hear back from Ms. Jepson. I was so upset when I did not hear back from anyone that day that I took the next day off, Friday, April 8. I was already scheduled to be off on Monday, April 11. I worked the rest of the week of April 12th. The whole week went by, and not a single person from First National or Arrowpoint contacted me.

15. Shortly thereafter, Stamatoglou (First National's COO) retaliated against me for my complaint of sexual harassment against the person who is both her "bestie" and a key First National business partner. In March 2016 I was told by Stamatoglou and my other superiors that I would be promoted to a "bidder" for the upcoming Cook County Annual Tax Sale. However, on April 25, 2016, after I had complained about Athanasopoulos' presence in the new office space, Stamatoglou decided that there was no longer an open "bidder" positon, even though everyone in the organization knew that there was such a position.

16. The above are only some of the examples of the lewd and crude sexual remarks Athanasopoulos made to me. I also heard him make such remarks to other female and male employees who worked near me. I complained repeatedly to Stamatoglou about how uncomfortable he made me and repeatedly asked her to get him to leave me alone. However, this was all to no avail, as his offensive conduct continued.

17. On April 26, 2016, I felt I had no choice but to resign from my employment at First National and Arrowpoint due to the severe and pervasive sexual harassment, which had

the effect of substantially interfering with my work performance and created an intimidating, hostile and offensive working environment. I just could not take it anymore. This was a constructive discharge. The severe and pervasive sexual harassment created a sexually hostile environment and such actions, as well as my constructive discharge, constituted violations of Title VII of the Civil Rights Act of 1964, as amended. I was retaliated against for making complaints of sexual harassment. The severe and pervasive sexual harassment, the sexually hostile environment, retaliation and constructive discharge also violated the Illinois Human Rights Act.

18. Later on April 26th, after I sent the entire thread again regarding the sexual harassment, along with my resignation, to the entire company, John Eisinger (President of First National and Arrowpoint's Managing Director) and Jill Jepson left me a voice message claiming they had "no idea." Jill claimed she never received my email and that it was caught in spam and it was missed, but simultaneously said that she was expecting to hear from me and was concerned that she had not heard from me and thought I was maybe doing some travels. Therefore, her comment that she had "no idea" about my email or the complaints of the harassment was blatantly false. If she never got my email or did not know of my complaints of sexual harassment, why would she be expecting to hear from me and concerned that she had not heard from me?

19. Another condition contributing to the sexually hostile environment was Stamatoglou's hiring of Ryan Logan as First National's IT person. It is my understanding that he had been convinced of serious sexual offenses, including rape, and that his name was on a sex

offender registry. This was a topic of discontent among us employees, and some employees complained to Stamatoglou.

20. I was also very offended by racially hostile remarks that Athanasopoulos made. For instance, shortly after our first office move Athanasopoulos remarked, "Oh, so they put all the Black girls to sit out here." He asked why we had all the "Black people" sitting out there. On another occasion he also asked me if Arrowpoint started firing employees, which one of the "Black girls" he should take for himself. The overall impression he made was that the "Black girls" were like property.

21. Others employees in the workplace who I believe still work for First National and Arrowpoint and to whom sexually or racially offensive remarks were made by Athanasopoulos or who would have overheard such remarks by Athanasopoulos to me and others, include: Lunya Fulton, Ajeenah Mursheed, Nick Troutman, Lindsey Abboushi, Matthew Lampert, Manuel Doctor, Stephen "Steve" Deely, Mary Cruz-Andrews, Laura McNellis, James "Jim" Finnerty, and James "Jim" Ryan.

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: Agency(ies) Charge No(s):

[ ] FEPA

[x] EEOC

**ILLINOIS DEPARTMENT OF HUMAN RIGHTS** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Eliza Garzon** | **773.497.6700** | **09/10/1980** |

Street Address: **4148 S. Michigan Ave., #2**

City, State and ZIP Code: **Chicago, Illinois 60653**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **First National Assets Management, LLC** | **25** | **312.683.0800** |

Street Address: **120 N. LaSalle, Suite #1220**

City, State and ZIP Code: **Chicago, Illinois 60602**

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

Street Address:

City, State and ZIP Code:

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

[ ] RACE [ ] COLOR [X] SEX [ ] RELIGION [ ] NATIONAL ORIGIN

[X] RETALIATION [ ] AGE [ ] DISABILITY [ ] GENETIC INFORMATION

[ ] OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE

| Earliest | Latest |
|---|---|
| **2013** | **April 26, 2016** |

[X] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

**SEE ATTACHED PARTICULARS**

RECEIVED EEOC

JUN 22 2016

CHICAGO DISTRICT OFFICE

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

6·21·16 [signature]

Date     *Charging Party Signature*

NOTARY – *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*

UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

ELIZA GARZON
4148 S. Michigan Ave., #2
Chicago, IL 60653

Charging Party,

Vs.

First National Assets Management, LLC
120 N. LaSalle, Suite #1220
Chicago, IL 60602

Respondent.

**PARTICULARS TO CHARGE OF DISCRIMINATION**

1. I, Eliza Garzon, reside at 4148 S. Michigan Ave., #2, Chicago, IL 60653. I ask that this Charge of Discrimination be dual-filed with the Illinois Department of Human Rights, and, in connection with this cross-filing, I name Olibia Stamatoglou (First National's COO) and David Corkins (Arrowpoint's Co-Founder and First National's CEO) for permitting the sexual harassment and hostile work environment that is discussed below.

2. I was hired by First National Assets Management, LLC ("First National") in February 2011 as a Portfolio Administrator. At the time of my constructive discharge on April 26, 2016, I was a Tax Lien Servicing Supervisor, responsible for performing duties relating to servicing tax liens.

3. It is my understanding that Arrowpoint Partners, LLC ("Arrowpoint") became the majority owner of First National and assumed control of labor relations over the employees who had been First National employees in approximately August 2015.

4. Ms. Stamatoglou (First National COO) was my supervisor while I worked at First National and Arrowpoint.

5. James Athanasopoulos is a co-founder of the James Group. It is my understanding that he or one of the companies that he owns purchases many of First National's properties, and he is on First National's or one of its affiliate's advisory board.

6. Mr. Athanasopoulos frequently came to the First National offices where I worked under the supervision of Stamatoglou. Beginning in about 2013, I often complained to Stamatoglou about Mr. Athanasopoulos' frequent offensive sexual remarks to me and the other employees in the office. As early as about 2013 I complained to Stamatoglou in an email about one such comment that Athanasopoulos made to me and asked to speak to her about it. Athanasopoulos sent me back a handwritten apology saying that he was sorry for offending me and that he thought that because of our rapport it was okay for him to "say something stupid" (see **Attachment A**). He characterized it as a "joke." Unfortunately, his offensive sexual, as well as racial, comments did not stop after he gave me the apology note.

7. Later, in 2013 or 2014, when our company moved into a new space, the First National receptionist, Kiki Kouris, did not at first have her desk set up. As a result, she was temporarily working out of an office. Athanasopoulos asked me who she "f . . . d" to get an office. I told Athanasopoulos not to talk about Kiki like that. Nevertheless, Athanasopoulos continued to make the same comment to Kiki and others in the office.

8. In the period of 2014, 2015, and 2016, Athanasopoulos continued to make offensive, sexual remarks to me and other employees in the workplace. By way of example, he

told me I would be prettier if my "boobs" were bigger. He said to me, "Wow, are you on your period? Your boobs look bigger today." He told me to look at Lunya Fulton's boobs, that she has nice boobs and didn't I wish I had her boobs. On another occasion he told me, "You know who has nice boobs? Pam" (an employee from another company that we shared space with). Another example is when he asked me if I thought that Laura McNellis (Director of First National's REO division) and Stephen Deely (in-house counsel) got it on at the conventions they go to and then said that he believed that they do. Another time he asked me if I knew that Susan Mallmann's (Controller) husband cheats on her while he is away on business. Another offensive comment was when he asked me if I "wax down there" (meaning my private parts).

9. On another occasion during this period Athanasopoulos brought a pair of women's panties to me and smelled them. He told me that he took them from Laura's purse. I told him he was disgusting and he should never go into a woman's purse. He continued to hold them up and walked them around the office, asking other employees if they would like to smell them.

10. In November or December 2015, Stamatoglou, Tommy Diamantopoulos (a First National REO broker), and I were in the office kitchen. Athanasopoulos came up to me, with Stamatoglou standing right next to me. Athanasopoulos said to me, "I will buy you some boobs. All I ask is that you let me finish on them once a month." Stamatoglou just laughed. I told Athanasopoulos how disgusting he was. I felt humiliated, degraded, and disgusted. I walked out of the kitchen in considerable distress. I believe Tommy Diamantopoulos heard what Athanasopoulos said, because when I looked at him, his face looked to me like he was in

shock.

11. In November or December, 2015, Athanasopoulos hit me with his umbrella in my breasts as he walked past me. He did this deliberately. I immediately went to Stamatoglou's office and complained to her about this action. Stamatoglou got upset and told me that I was not the only one who kept complaining about him. She said he would not be allowed back.

12. In the following week Athanasopoulos returned to our office. After he left I went into Stamatoglou's office and reminded her that she told me that he would not be allowed back. She told me that she told him to stay away from me and that he would not be allowed in the new offices that we were moving to.

13. In early 2016, after a real estate convention that Stamatoglou had attended with John Eisinger, Managing Director of Arrowpoint, and Laura McNellis in Las Vegas, Stamatoglou called me into her office and told me that she felt that Eisinger was dancing very inappropriately with Laura. My first thought was that perhaps Laura had been uncomfortable with the situation, and so I told Stamatoglou that perhaps Laura did not know who to talk to about that. Stamatoglou gave me a strange look and told me how naive I was. She said I would be surprised as to what people would do to get ahead.

14. In approximately late March 2016, we moved into the new office space. On April 7, 2016, I was shocked when Athanasopoulos walked into the new space, as Stamatoglou had assured me that he would not be permitted in the new space. I emailed Stamatoglou immediately after he walked in. I sent her an email stating that I thought that Athanasopoulos was not welcome in the new space and indicated my displeasure. Athanasopoulos was

standing next to Stamatoglou at the time, and very shortly after I sent the email, he came out in front of where I sit, spun around with his arms raised, smiled, and stared at me. Stamatoglou at first attempted to deny that she had made the statement that Athanasopoulos would not be allowed in the new space. She indicated in the emails that he bought most of Laura McNellis' (Director of First National's REO division) properties, that he was on a First National Advisory Board, and that he was her "bestie." In response, I reminded her in an email that this is what she had told me after Athanasopoulos hit me in my breasts with his umbrella and that after he had come back, I asked why he was back and she told me that she had told him not to talk to me anymore and that he would not be allowed in the new space. Stamatoglou then sent me an email claiming that she did not remember that and that she only remembered that I had been upset about the "alleged incident." She asked if I wanted to file a formal complaint, and, if so, she would let HR know.

15. Stamatoglou ultimately told me that the person to contact to file a formal complaint was Jill Jepson, an Arrowpoint HR person. I then sent the email thread between me and Stamatoglou to Ms. Jepson and asked her how I would go about filing a formal complaint. I did not hear back from Ms. Jepson. I was so upset when I did not hear back from anyone that day that I took the next day off, Friday, April 8. I was already scheduled to be off on Monday, April 11. I worked the rest of the week of April 12th. The whole week went by, and not a single person from First National or Arrowpoint contacted me.

16. Shortly thereafter, Stamatoglou (First National's COO) retaliated against me for my complaint of sexual harassment against the person who is both her "bestie" and a key First

National business partner. In March 2016 I was told by Stamatoglou and my other superiors that I would be promoted to a "bidder" for the upcoming Cook County Annual Tax Sale. However, on April 25, 2016, after I had complained about Athanasopoulos' presence in the new office space, Stamatoglou decided that there was no longer an open "bidder" positon, even though everyone in the organization knew that there was such a position.

17. The above are only some of the examples of the lewd and crude sexual remarks Athanasopoulos made to me. I also heard him make such remarks to other female and male employees who worked near me. I complained repeatedly to Stamatoglou about how uncomfortable he made me and repeatedly asked her to get him to leave me alone. However, this was all to no avail, as his offensive conduct continued.

18. On April 26, 2016, I felt I had no choice but to resign from my employment at First National and Arrowpoint due to the severe and pervasive sexual harassment, which had the effect of substantially interfering with my work performance and created an intimidating, hostile and offensive working environment. I just could not take it anymore. This was a constructive discharge. The severe and pervasive sexual harassment created a sexually hostile environment and such actions, as well as my constructive discharge, constituted violations of Title VII of the Civil Rights Act of 1964, as amended. I was retaliated against for making complaints of sexual harassment. The severe and pervasive sexual harassment, the sexually hostile environment, retaliation and constructive discharge also violated the Illinois Human Rights Act.

19. Later on April 26th, after I sent the entire thread again regarding the sexual

harassment, along with my resignation, to the entire company, John Eisinger (President of First National and Arrowpoint's Managing Director) and Jill Jepson left me a voice message claiming they had "no idea." Jill claimed she never received my email and that it was caught in spam and it was missed, but simultaneously said that she was expecting to hear from me and was concerned that she had not heard from me and thought I was maybe doing some travels. Therefore, her comment that she had "no idea" about my email or the complaints of the harassment was blatantly false. If she never got my email or did not know of my complaints of sexual harassment, why would she be expecting to hear from me and concerned that she had not heard from me?

20. Another condition contributing to the sexually hostile environment was Stamatoglou's hiring of Ryan Logan as First National's IT person. It is my understanding that he had been convinced of serious sexual offenses, including rape, and that his name was on a sex offender registry. This was a topic of discontent among us employees, and some employees complained to Stamatoglou.

21. I was also very offended by racially hostile remarks that Athanasopoulos made. For instance, shortly after our first office move Athanasopoulos remarked, "Oh, so they put all the Black girls to sit out here." He asked why we had all the "Black people" sitting out there. On another occasion he also asked me if Arrowpoint started firing employees, which one of the "Black girls" he should take for himself. The overall impression he made was that the "Black girls" were like property.

22. Others employees in the workplace who I believe still work for First National and

Arrowpoint and to whom sexually or racially offensive remarks were made by Athanasopoulos or who would have overheard such remarks by Athanasopoulos to me and others, include: Lunya Fulton, Ajeenah Mursheed, Nick Troutman, Lindsey Abboushi, Matthew Lampert, Manuel Doctor, Stephen "Steve" Deely, Mary Cruz-Andrews, Laura McNellis, James "Jim" Finnerty, and James "Jim" Ryan.

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: Agency(ies) Charge No(s):

[ ] FEPA
[x] EEOC

ILLINOIS DEPARTMENT OF HUMAN RIGHTS and EEOC

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Eliza Garzon | 773.497.6700 | 09/10/1980 |

| Street Address | City, State and ZIP Code |
|---|---|
| 4148 S. Michigan Ave., #2 | Chicago, Illinois 60653 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Arrowpoint Partners, LLC | 25 | 303.398.2929 |

| Street Address | City, State and ZIP Code |
|---|---|
| 100 Fillmore Street, Suite 325 | Denver, CO 80206 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (*Check appropriate box(es).*)

[ ] RACE [ ] COLOR [X] SEX [ ] RELIGION [ ] NATIONAL ORIGIN
[X] RETALIATION [ ] AGE [ ] DISABILITY [ ] GENETIC INFORMATION
[ ] OTHER (*Specify*)

DATE(S) DISCRIMINATION TOOK PLACE

| Earliest | Latest |
|---|---|
| 2013 | April 26, 2016 |

[X] CONTINUING ACTION

THE PARTICULARS ARE (*If additional paper is needed, attach extra sheet(s)*):

**SEE ATTACHED PARTICULARS**

RECEIVED EEOC
JUN 22 2016
CHICAGO DISTRICT OFFICE

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

6-21-16
Date

Charging Party Signature

NOTARY – *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(*month, day, year*)

**UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

ELIZA GARZON
4148 S. Michigan Ave., #2
Chicago, IL 60653

Charging Party,

Vs.

Arrowpoint Partners, LLC
100 Fillmore Street, Suite 325
Denver, CO 80206

Respondent.

**PARTICULARS TO CHARGE OF DISCRIMINATION**

1. I, Eliza Garzon, reside at 4148 S. Michigan Ave., #2, Chicago, IL 60653. I ask that this Charge of Discrimination be dual-filed with the Illinois Department of Human Rights, and, in connection with this cross-filing, I name Olibia Stamatoglou (First National's COO) and David Corkins (Arrowpoint's Co-Founder and First National's CEO) for permitting the sexual harassment and hostile work environment that is discussed below.

2. I was hired by First National Assets Management, LLC ("First National") in February 2011 as a Portfolio Administrator. At the time of my constructive discharge on April 26, 2016, I was a Tax Lien Servicing Supervisor, responsible for performing duties relating to servicing tax liens.

3. It is my understanding that Arrowpoint Partners, LLC ("Arrowpoint") became the majority owner of First National and assumed control of labor relations over the employees who had been First National employees in approximately August 2015.

4. Ms. Stamatoglou (First National COO) was my supervisor while I worked at First National and Arrowpoint.

5. James Athanasopoulos is a co-founder of the James Group. It is my understanding that he or one of the companies that he owns purchases many of First National's properties, and he is on First National's or one of its affiliate's advisory board.

6. Mr. Athanasopoulos frequently came to the First National offices where I worked under the supervision of Stamatoglou. Beginning in about 2013, I often complained to Stamatoglou about Mr. Athanasopoulos' frequent offensive sexual remarks to me and the other employees in the office. As early as about 2013 I complained to Stamatoglou in an email about one such comment that Athanasopoulos made to me and asked to speak to her about it. Athanasopoulos sent me back a handwritten apology saying that he was sorry for offending me and that he thought that because of our rapport it was okay for him to "say something stupid" (see **Attachment A**). He characterized it as a "joke." Unfortunately, his offensive sexual, as well as racial, comments did not stop after he gave me the apology note.

7. Later, in 2013 or 2014, when our company moved into a new space, the First National receptionist, Kiki Kouris, did not at first have her desk set up. As a result, she was temporarily working out of an office. Athanasopoulos asked me who she "f . . . d" to get an office. I told Athanasopoulos not to talk about Kiki like that. Nevertheless, Athanasopoulos continued to make the same comment to Kiki and others in the office.

8. In the period of 2014, 2015, and 2016, Athanasopoulos continued to make offensive, sexual remarks to me and other employees in the workplace. By way of example, he

told me I would be prettier if my "boobs" were bigger. He said to me, "Wow, are you on your period? Your boobs look bigger today." He told me to look at Lunya Fulton's boobs, that she has nice boobs and didn't I wish I had her boobs. On another occasion he told me, "You know who has nice boobs? Pam" (an employee from another company that we shared space with). Another example is when he asked me if I thought that Laura McNellis (Director of First National's REO division) and Stephen Deely (in-house counsel) got it on at the conventions they go to and then said that he believed that they do. Another time he asked me if I knew that Susan Mallmann's (Controller) husband cheats on her while he is away on business. Another offensive comment was when he asked me if I "wax down there" (meaning my private parts).

9. On another occasion during this period Athanasopoulos brought a pair of women's panties to me and smelled them. He told me that he took them from Laura's purse. I told him he was disgusting and he should never go into a woman's purse. He continued to hold them up and walked them around the office, asking other employees if they would like to smell them.

10. In November or December 2015, Stamatoglou, Tommy Diamantopoulos (a First National REO broker), and I were in the office kitchen. Athanasopoulos came up to me, with Stamatoglou standing right next to me. Athanasopoulos said to me, "I will buy you some boobs. All I ask is that you let me finish on them once a month." Stamatoglou just laughed. I told Athanasopoulos how disgusting he was. I felt humiliated, degraded, and disgusted. I walked out of the kitchen in considerable distress. I believe Tommy Diamantopoulos heard what Athanasopoulos said, because when I looked at him, his face looked to me like he was in

shock.

11. In November or December, 2015, Athanasopoulos hit me with his umbrella in my breasts as he walked past me. He did this deliberately. I immediately went to Stamatoglou's office and complained to her about this action. Stamatoglou got upset and told me that I was not the only one who kept complaining about him. She said he would not be allowed back.

12. In the following week Athanasopoulos returned to our office. After he left I went into Stamatoglou's office and reminded her that she told me that he would not be allowed back. She told me that she told him to stay away from me and that he would not be allowed in the new offices that we were moving to.

13. In early 2016, after a real estate convention that Stamatoglou had attended with John Eisinger, Managing Director of Arrowpoint, and Laura McNellis in Las Vegas, Stamatoglou called me into her office and told me that she felt that Eisinger was dancing very inappropriately with Laura. My first thought was that perhaps Laura had been uncomfortable with the situation, and so I told Stamatoglou that perhaps Laura did not know who to talk to about that. Stamatoglou gave me a strange look and told me how naive I was. She said I would be surprised as to what people would do to get ahead.

14. In approximately late March 2016, we moved into the new office space. On April 7, 2016, I was shocked when Athanasopoulos walked into the new space, as Stamatoglou had assured me that he would not be permitted in the new space. I emailed Stamatoglou immediately after he walked in. I sent her an email stating that I thought that Athanasopoulos was not welcome in the new space and indicated my displeasure. Athanasopoulos was

standing next to Stamatoglou at the time, and very shortly after I sent the email, he came out in front of where I sit, spun around with his arms raised, smiled, and stared at me. Stamatoglou at first attempted to deny that she had made the statement that Athanasopoulos would not be allowed in the new space. She indicated in the emails that he bought most of Laura McNellis' (Director of First National's REO division) properties, that he was on a First National Advisory Board, and that he was her "bestie." In response, I reminded her in an email that this is what she had told me after Athanasopoulos hit me in my breasts with his umbrella and that after he had come back, I asked why he was back and she told me that she had told him not to talk to me anymore and that he would not be allowed in the new space. Stamatoglou then sent me an email claiming that she did not remember that and that she only remembered that I had been upset about the "alleged incident." She asked if I wanted to file a formal complaint, and, if so, she would let HR know.

15. Stamatoglou ultimately told me that the person to contact to file a formal complaint was Jill Jepson, an Arrowpoint HR person. I then sent the email thread between me and Stamatoglou to Ms. Jepson and asked her how I would go about filing a formal complaint. I did not hear back from Ms. Jepson. I was so upset when I did not hear back from anyone that day that I took the next day off, Friday, April 8. I was already scheduled to be off on Monday, April 11. I worked the rest of the week of April 12th. The whole week went by, and not a single person from First National or Arrowpoint contacted me.

16. Shortly thereafter, Stamatoglou (First National's COO) retaliated against me for my complaint of sexual harassment against the person who is both her "bestie" and a key First

National business partner. In March 2016 I was told by Stamatoglou and my other superiors that I would be promoted to a "bidder" for the upcoming Cook County Annual Tax Sale. However, on April 25, 2016, after I had complained about Athanasopoulos' presence in the new office space, Stamatoglou decided that there was no longer an open "bidder" positon, even though everyone in the organization knew that there was such a position.

17. The above are only some of the examples of the lewd and crude sexual remarks Athanasopoulos made to me. I also heard him make such remarks to other female and male employees who worked near me. I complained repeatedly to Stamatoglou about how uncomfortable he made me and repeatedly asked her to get him to leave me alone. However, this was all to no avail, as his offensive conduct continued.

18. On April 26, 2016, I felt I had no choice but to resign from my employment at First National and Arrowpoint due to the severe and pervasive sexual harassment, which had the effect of substantially interfering with my work performance and created an intimidating, hostile and offensive working environment. I just could not take it anymore. This was a constructive discharge. The severe and pervasive sexual harassment created a sexually hostile environment and such actions, as well as my constructive discharge, constituted violations of Title VII of the Civil Rights Act of 1964, as amended. I was retaliated against for making complaints of sexual harassment. The severe and pervasive sexual harassment, the sexually hostile environment, retaliation and constructive discharge also violated the Illinois Human Rights Act.

19. Later on April 26th, after I sent the entire thread again regarding the sexual

harassment, along with my resignation, to the entire company, John Eisinger (President of First National and Arrowpoint's Managing Director) and Jill Jepson left me a voice message claiming they had "no idea." Jill claimed she never received my email and that it was caught in spam and it was missed, but simultaneously said that she was expecting to hear from me and was concerned that she had not heard from me and thought I was maybe doing some travels. Therefore, her comment that she had "no idea" about my email or the complaints of the harassment was blatantly false. If she never got my email or did not know of my complaints of sexual harassment, why would she be expecting to hear from me and concerned that she had not heard from me?

20. Another condition contributing to the sexually hostile environment was Stamatoglou's hiring of Ryan Logan as First National's IT person. It is my understanding that he had been convinced of serious sexual offenses, including rape, and that his name was on a sex offender registry. This was a topic of discontent among us employees, and some employees complained to Stamatoglou.

21. I was also very offended by racially hostile remarks that Athanasopoulos made. For instance, shortly after our first office move Athanasopoulos remarked, "Oh, so they put all the Black girls to sit out here." He asked why we had all the "Black people" sitting out there. On another occasion he also asked me if Arrowpoint started firing employees, which one of the "Black girls" he should take for himself. The overall impression he made was that the "Black girls" were like property.

22. Others employees in the workplace who I believe still work for First National and

Arrowpoint and to whom sexually or racially offensive remarks were made by Athanasopoulos or who would have overheard such remarks by Athanasopoulos to me and others, include: Lunya Fulton, Ajeenah Mursheed, Nick Troutman, Lindsey Abboushi, Matthew Lampert, Manuel Doctor, Stephen "Steve" Deely, Mary Cruz-Andrews, Laura McNellis, James "Jim" Finnerty, and James "Jim" Ryan.

EEOC Form 161-B (11/09)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To: **Eliza Garzon**
**C/O Mark H. Horwitch**
**Tabet Divito & Rothstein, LLC**
**209 S. LaSalle Street, 7th Floor**
**Chicago, Illinois 60604**

From: **Chicago District Office**
**500 West Madison St**
**Suite 2000**
**Chicago, IL 60661**

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **440-2016-04405** | **Carol Milazzo, Investigator** | **(312) 869-8133** |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Julianne Bowman

**Julianne Bowman,**
**District Director**

9/22/16
*(Date Mailed)*

Enclosures(s)

cc: **Arrowpoint Partners, LLC**
**C/O Patrick W. Spangler**
**Vedder Price**
**222 North LaSalle Street**
**Chicago, Illinois 60601**